[Crim. No. 890. First Appellate District, Division Two.—July 26, 1920.]

THE PEOPLE, Respondent, v. MAX LEPKOJES, Appellant.

[1] CRIMINAL LAW — SUFFICIENCY OF EVIDENCE — MOTION FOR NEW TRIAL—DUTY OF TRIAL JUDGE—PRESUMPTION.—In a criminal prosecution, unless the trial judge is satisfied that the verdict of the jury is sustained by the evidence, it is his duty to set it aside on motion for a new trial; and after a jury has reached a verdict of guilty, on appeal every intendment is in favor of the regularity and propriety of the action of the trial court in denying, as in granting, a motion for a new trial.

[2] ID.—ARSON — PROOF BY CIRCUMSTANTIAL EVIDENCE. — Arson, like other crimes, may and frequently must be proved by circumstantial evidence.

[3] ID.—INFERENCE OF LEGAL GUILT—SUFFICIENCY OF CIRCUMSTANTIAL EVIDENCE. — The law does not require, in order to justify the inference of legal guilt in cases of circumstantial evidence, that the existence of inculpatory facts must be absolutely incompatible with the innocence of the accused and incapable of explanation upon any other reasonable hypothesis than that of guilt, but only that the facts shall not only be consistent with the guilt of the accused, but inconsistent with any other rational conclusion.

[4] ID.—ARSON — CIRCUMSTANTIAL EVIDENCE — VERDICT — DENIAL OF NEW TRIAL—APPEAL.—In this prosecution for arson, the circum-

stances submitted to the jury being sufficient to meet every re-
quirement of the law to support their verdict of guilty, the
appellate court could not reverse the judgment, nor declare as a
matter of law that the trial judge was guilty of an abuse of
discretion in refusing to grant a new trial.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco. Franklin A. Griffin,
Judge. Affirmed.

The facts are stated in the opinion of the court.

Martin Stevens for Appellant.

U. S. Webb, Attorney-General, and John H. Riordan,
Deputy Attorney-General, for Respondent.

BRITTAIN, J.—The appellant, who was convicted of
arson, appeals from the judgment and from the order de-
nying his motion for a new trial. It is conceded that the
fire was of incendiary origin and that the appellant had an
opportunity to commit the crime. Because of the circum-
stantial character of the evidence, the appellant contends the
verdict should have been set aside on the ground that the
possibility of the crime having been committed by another
was not excluded.

The entire record has been examined with painstaking
care and the conclusion has been reached that this court
ought not set aside the verdict. It was disclosed on the
part of the appellant that the case had been tried before
and that the verdict of guilty on the first trial had been
set aside on motion for a new trial. The same judge pre-
sided at the second trial. Like the jurors, he heard and
saw the witnesses. [1] Unless he was satisfied that it
was sustained by the evidence, it was his duty to set aside
the second verdict as he did the first. (*People* v. *Knutte,*
111 Cal. 453, [44 Pac. 166]; *People* v. *Chew Wing Gow,*
120 Cal. 298, [52 Pac. 657].) The discretion vested in the
trial court to grant a new trial is presumed to have been
lawfully exercised. (*People* v. *Hotz,* 73 Cal. 241, [14 Pac.
856]; *People* v. *Brooks,* 90 Cal. 174, [27 Pac. 72].) In
criminal cases these rules are more frequently invoked in
favor of the accused than on the part of the state, but

despite the leniency which courts habitually show to those charged with crime, after a jury has reached a verdict of guilty, on appeal every intendment is in favor of the regularity and propriety of the action of the trial court in denying, as in granting, a motion for a new trial.

[2] Arson, like other crimes, may and frequently must be proved by circumstantial evidence. (*People* v. *Scott,* 13 Cal. App. 301, [109 Pac. 498]; *People* v. *Urquidas,* 96 Cal. 239, [31 Pac. 52]; *People* v. *Morrow,* 60 Cal. 142.) [3] The law does not require, in order to justify the inference of legal guilt in cases of circumstantial evidence, that the·existence of inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt. The true rule is that the facts shall not only be consistent with the guilt of the accused, but inconsistent with any other rational conclusion. (*People* v. *Murray,* 41 Cal. 66; *People* v. *Davis,* 64 Cal. 440, [1 Pac. 889]; *People* v. *Bellamy,* 109 Cal. 610, [42 Pac. 236].)

In applying these rules to the facts shown by the evidence it is not necessary to recite every circumstance disclosed in a trial in which the taking of evidence occupied five days. While all the circumstances must be considered, where the accused and the people rely upon different and unrelated trains of circumstances to reach opposed conclusions, the outstanding facts in each train may be best understood if stated separately.

The property where the fire occurred was owned by a Mrs. Larson, aged fifty-two. For many years she had been a widow. She had one child, a daughter, aged twenty-six, at the time of the fire. The property had been purchased under an installment contract in 1914 and the final payment was not made until some time in 1918. Title was then transferred to Mrs. Larson, who assumed a mortgage of $2,000 on the property. At that time the insurance policy for $3,000 held by the mortgagee was assigned to Mrs. Larson. At the time of the fire the mortgage debt had been reduced to about $1,800. The building was an old one, and on the adjustment of the fire loss its value was established at $3,500. The insurance adjustment covered the loss from three fires which occurred

respectively on April 1, April 29 and June 8, 1919. The present accusation relates only to the fire of April 1.

Before moving to the house which was burned, on California Street near Tenth Avenue, in San Francisco, in 1914, Mrs. Larson with her daughter lived in a larger house on Folsom Street. In 1907 the accused became a member of her family, or at least rented a room in her house with the privilege of cooking his own meals in its basement, but sometimes he was invited to eat his meals with Mrs. Larson and her daughter. He was a vegetarian and preferred to cook his own meals. He moved with the Larsons to the California Street house, and continued to live there until the fire of April 1, 1919. In November, 1918, Mrs. Larson rented another house on Clay Street, to which she moved with her daughter, the appellant remaining in the California Street house. The Clay Street house was about the same size as the Folsom Street house, but the Larsons did not move their belongings at once. At intervals between November and the time of the fire, four months later, they moved many small loads of furniture and boxes. In March, 1919, while still occupying the Clay Street house, Mrs. Larson rented, but neither she nor her daughter moved to, another house on Pine Street, to which some of the things from the California Street house were moved. During the four months the Larsons were moving they were frequently at the California Street house, and Miss Larson was there with the appellant on Wednesday and Thursday preceding the fire, which occurred about 2 o'clock in the morning of Tuesday, April 1, 1919.

On the evening of March 31st a Mrs. Harrington, living next door the the Larson house, had a visitor, who called attention to noises in the Larson house, in the room close to that in which they were sitting. The son of Mrs. Harrington, who had been twice married, was the witness Schaeffer, a member of the fire department, and the first person to enter the house after the fire was discovered. About 2 o'clock in the morning the witness Cowing, a letter-carrier, who was returning from his work to his home adjoining the Harrington house, saw smoke coming from the upper windows of the Larson house. His wife was sick. He first aroused her, and then rang the Har-

48 Cal. App.—42

rington bell, believing the occupants of those houses to be in danger. After hurriedly telling them there was a fire next door, he ran to the fire-alarm box in the next block, where he turned in the alarm, returning at once to the scene of the fire.

When Cowing returned the appellant was at the bottom of the front steps, apparently fully dressed and wearing his hat. He deposited on the sidewalk a large bundle, which was later found to contain bedding. The appellant walked to a side door leading to the basement. Cowing got to the door about the same time. There was heavy smoke issuing from the door. Cowing then heard the appellant say, not in a loud tone, "Fire! Fire!" A moment later Schaeffer, who had partly dressed, entered the basement at the side door, but was compelled to withdraw by reason of the smoke and pungent fumes. While inside he saw two distinct fires burning, and it was later discovered there were three such fires in the basement alone.

After the arrival of the chemical engine the basement fires and others on the first and second floors were extinguished. While the firemen were still in the house, where they had been joined by the acting fire marshal, a policeman saw the appellant approaching the house, and at first stopped him, but on being told that the appellant lived there, he accompanied him into the house. The appellant was taken to the fire marshal and his answers to questions then asked him were such that the marshal directed the policeman to arrest him on the charge of arson.

The whole house was littered with tin cans, bottles, and paper. At various places were what the marshal called "plants," meaning easily fired materials piled together with the appearance of having been placed for the purpose of incendiarism. Sliding doors had been pulled out and the space behind them stuffed with papers and rags. At other places, old wooden inside blinds had been chopped to pieces and piled around similar kindlings of paper. There were a number of these so-called plants, some of which had been ignited while some were unburned. There was a strong odor of alcohol, and uncorked bottles of alcohol, filled or partly filled, were found placed close to the plants or some of them. One of the plants in which there

was a partly burned candle was at the door of the bath-
room, adjoining the room occupied by the appellant. A
section of flooring, making a hole about thirty-two inches
by three feet, had been removed from a closet under the
stairway, making a draft from the basement to the first
floor.

The appellant testified in his own behalf, and his story
did not differ greatly from that he told to the fire marshal
and the policeman. He said he went to the house early
in the evening before the fire and, the hall being dark,
he went at once to his room. He did not enter the bath-
room. He was cold and on removing his other clothing
he retained his undershirt, putting his pajama shirt on
over that. He was suffering from chilblains, and after
removing his stockings, he anointed his feet and put on
others. This statement is important, because the fact
that he had had time to put on his socks after discovering
the fire was commented on by the fire marshal, and the
socks, he said, he had removed were neither in the bundle
he carried out nor were they discovered in a subsequent
search of his room, which was untouched by the fire. If
they had been discovered, they would no doubt have been
produced, as were other things discovered in his room
by his counsel. He further stated that he had had
trouble with his ears and before going to bed he had put
some medicament in them and had then closed them with
absorbent cotton. He was awakened and perceived the
odor of smoke. He did not know from whence it came,
but as it became stronger he arose, pulled on his trousers
and shoes, and in the dark gathered together such clothing
and bedding as he could in a bundle made of a part of
the bedding, put on his hat and unlocked the door of his
room. On going into the hall he discovered the fire was
in the house from which he was fleeing with his bundle.
He went downstairs to the front door, but did not imme-
diately open it. He stopped at the door in the dark to put
on his coat and vest. He then unlocked the front door
and went out. He saw Cowing, the letterman, and stated
that he at once called ''Fire! Fire!'' He took his bundle
down the front steps, and then went around to the side
door. Some time before, the lock to his door having been
broken, he had braced the door so that it could not be

opened from the outside, but he went there, in his excitement, and pushed it open, only to be driven back by the smoke. When he told his story the fire marshal commented on his stockings. He was taken to his room, but did not make the explanation concerning the chilblains nor point out the socks he had removed. When the fire marshal spoke of his shoes being laced he said he had laced them while he was on the sidewalk. In regard to the hole in the flooring, he said he was building a stairway, and when the marshal said no one had ever seen a stairway opening of that size, the appellant replied that he was building it on the installment plan. Notwithstanding the fact that the appellant's employer and one of his coemployees testified that for eleven years he had been in the employ of one concern as a cabinet-maker, his duties had been faithfully performed and that his reputation for veracity was good, the circumstances detailed were at least consistent with the guilt of the appellant. To sustain the conviction, however, the evidence must also had been inconsistent with any other rational hypothesis.

Under the facts of the case the only other hypotheses suggested are that the appellant was insane, but this is denied by him; that the fire was the work of boys or other vandals not actuated by motives of malice, but the careful preparation for the fire, which the marshal testified would have taken a man at least a full day, removes this theory from the realm of rationalism; that the fire was started by or at the instance of the owner for the purpose of collecting the insurance without the knowledge of the appellant, but it is inconceivable that after twelve years' intimate acquaintance with him, these multiple fires would have been started in the lower part of the house in which he was known to be sleeping. The only rational conclusion based upon any assumption of a purpose of collecting insurance is that the appellant must have been a party to the crime. But one other hypothesis is advanced. It is that the fire was started by those designated in the evidence of Mrs. Larson as I. W. W.'s or pro-Germans, and it is upon this that the appellant places his strongest plea for reversal.

After the Larsons moved or started to move to the Clay Street house they had as roomers a Mrs. Parsons and her

son. Mrs. Larson testified they told her the son was a fugitive from justice who had been arrested in Chicago as a slacker from military service. About two weeks before the fire, she testified, she reported the son to the officers of the government, and he was arrested. On the same day the mother left the house. The son was discharged from custody, and the whereabouts of the Parsons were unknown at the time of the trial. On March 27th, which was the day Miss Larson last visited the house with the appellant, there was mailed in San Francisco an anonymous typewritten note addressed to Mrs. Larson, reading as follows: "You are stuck on the federals aint you—we will fix you so cutey that you never know what happened to you, report the slackers will you do it again and the Irish." There were three other typewritten anonymous letters produced at the trial. There was a suggestion that Parsons had used the typewriter owned by Miss Larson and which both she and her mother used, but these letters could not have been written before his arrest on the charge of Mrs. Larson, and he had no access to the machine afterward. The language of the first note is unusual in its reference to the "federals." In her testimony Mrs. Larson, in response to a question by the attorney for the appellant, about Parsons, said, "He was a slacker and was a fugitive from the federals from Chicago and was in hiding." Again, "His mother said they were hiding and were very much afraid the federals would catch them." Again. "He was later indicted by the federals of—what do you call it—slacker?"

The insurance policy was not canceled immediately after the first fire. The appellant was released on bonds, and took up his abode in the Pine Street house, alone, Mrs. Larson and her daughter remaining in the Clay Street house. On April 10th another anonymous letter was mailed. It referred to the collection, presumably of insurance money. A third letter, with an indistinct post date, probably mailed before the one of April 10th, spoke of "this last one" as an April fool joke. On April 29th strangers in the city who were desirous of seeing Chinatown went with Mrs. Larson, Miss Larson, and the appellant, to Oakland to see a moving picture of Chinatown instead. They returned to the Clay Street house about midnight

and were then informed that the California Street house had again been set on fire. They had refreshments and the next afternoon Miss Larson went to the California Street house to ascertain the character of the injury. There was no direct evidence concerning the Oakland trip other than their own. On May 19th the last of the anonymous letters was mailed. It referred to things happening to Germans who came to Mrs. Larson four years before, and said that two of them had committed suicide "rather than be giving evidence against the peoples." There were references to Lenine and Trotzsky, and to burning. The last fire occurred on June 8th. The insurance was then canceled, and thereafter there were neither any more fires at the California Street house nor any more anonymous letters. There was no offer of evidence that anything had happened to any Germans, or that Mrs. Larson had any communication with the federals, as she called the government agents, except in connection with the arrest of Parsons, who was released. The appellant, though he had been for many years a resident of the United States, was born in East Prussia, and was registered as an alien enemy, yet he was not only left in charge of the property of Mrs. Larson, but after the first trial she employed as her own counsel the gentleman who was substituted as the attorney for the appellant.

There are certain other circumstances which the jury had the right to and no doubt did consider, in connection with the claim of pro-German or I. W. W. activities. When the Larsons moved from California Street to Clay Street the gas was turned off from the house, but the electric service was continued. All the light bulbs but one were then removed. It was left in a fixture in the second story hall just outside of the room occupied by the appellant. The appellant moved his cooking utensils then from the basement to a room adjoining his sleeping-room. He had a stove or range burning oil or gasoline. In his bedroom were various articles of furniture for his comfort. There were curtains both at the window and across an alcove to form a closet for his clothing. There were cheap pictures on the walls, and rugs on the floor, so that but for the fact of his being alone he was in a very comfortable nest. There was, perhaps, a reason for his lock-

ing the door of his sleeping-room on the night of the fire. The back basement door could not be locked, and any stroller might have entered the basement, and by way of the hole in the floor have gained the first floor from which he would have had the run of the house.

The moving, having been carried on for four months or more, had been about completed, and on the Wednesday before the fire Miss Larson removed all the furniture, except his cot, from the appellant's rooms. She took away his oil stove and cooking utensils and all his personal belongings except an alarm clock and an old discarded coat. She took the curtains, rugs, even the cheap pictures from the walls, but she left as they had been left during the four months when no one was in the house during the day, in the front room locked with a common lock, in the basement that any stroller might enter, a number of boxes, a Circassian walnut bedstead worth $350, and several large paintings by famous artists, which she valued at $800. These things she testified were there on Wednesday and on Thursday when she went back to get a jardiniere or two, and carried away the last remaining light bulb. On the morning of the fire when she visited the place with her mother the boxes, the bedstead, and the paintings were gone, and in their place were the dead branches of an acacia tree which had grown in the yard. There was no insurance on these valuable things, but shortly before the fire there was a ten days' covering note on the contents of the house, for $1,000. It was allowed to lapse because most of the furniture had been removed to the California Street house, notwithstanding the boxes in the basement and the bedstead and pictures. Miss Larson testified further that after the $3,000 policy was assigned she learned that there was a mistake in the rate of insurance and she visited the insurance office and had the rate corrected. At that time, she further testified, the man told her that of the $3,000 insurance, $1,000 was on the household furniture of the persons from whom her mother bought, and that she had that $1,000 canceled, reducing the policy to $2,000. Because her mother had expended $700 in improvements in the house, she had had the policy increased to $3,000. The policy was introduced in evidence. It was for the term of three years from April 2, 1918. It was for

$3,000 on the improvements, with nothing on any furniture. It was never reduced to $2,000 and never re-raised to $3,000. It would be a work of supererogation to go further with the analysis of the evidence. That introduced on behalf of the appellant was full of contradictions and palpable misstatements, of fantastic explanation and improbable stories. The jury simply did not believe the stories on which the theory of the I. W. W. or Pro-German intervention was based.

The appellant claims he is the victim of a made case by the acting fire marshal and the arresting policeman, and bases this charge upon the facts that after both the first and second fires the marshal, in endeavoring to surprise a confession, made admittedly false statements to both the appellant and to Mrs. Larson. Regardless of the evil of such statements, which are far too common with those charged with the duty of investigating crimes, the particular statements do not in any way bear on this case except as to the credit which the jury gave the evidence of the marshal and the policeman. The jury saw them and heard them and was the judge of their credibility as witnesses under oath.

[4] In view of the entire record the circumstances submitted to the jury meet every requirement of the law to support the verdict. In such a case this court cannot reverse the judgment, nor declare as a matter of law that the trial judge was guilty of any abuse of discretion in refusing to grant a new trial. The various matters in which it is claimed that the court erred in the admission and exclusion of evidence have been examined, although neither argument nor citation of authority is made to support the claims. The contentions have been fully answered in the brief of the attorney-general. They are entirely devoid of merit, and do not warrant serious discussion.

The judgment and order denying a new trial are both affirmed.

Nourse, J., and Langdon, P. J., concurred.